NOTICE: Summary decisions issued by the Appeals Court pursuant to M.A.C. Rule 23.0, as appearing in 97 Mass. App. Ct. 1017 (2020) (formerly known as rule 1:28, as amended by 73 Mass. App. Ct. 1001 [2009]), are primarily directed to the parties and, therefore, may not fully address the facts of the case or the panel's decisional rationale. Moreover, such decisions are not circulated to the entire court and, therefore, represent only the views of the panel that decided the case. A summary decision pursuant to rule 23.0 or rule 1:28 issued after February 25, 2008, may be cited for its persuasive value but, because of the limitations noted above, not as binding precedent. See Chace v. Curran, 71 Mass. App. Ct. 258, 260 n.4 (2008).

COMMONWEALTH OF MASSACHUSETTS

APPEALS COURT

21-P-1072

JOSEPH C. KELLEY

vs.

DEPARTMENT OF CONSERVATION AND RECREATION.

MEMORANDUM AND ORDER PURSUANT TO RULE 23.0

The plaintiff, Joseph Kelley, brought this action against the Massachusetts Department of Conservation and Recreation (department) under G. L. c. 151B, asserting age discrimination and retaliation. After trial, the jury returned a verdict for the department. With respect to the retaliation claim, the jury answered the relevant special verdict questions as follows: "(1) Do you find that the Plaintiff has proven that he engaged in protected activity in that he acted reasonably and in good faith in reporting alleged sexual harassment? Yes." "(2) Do you find that the Plaintiff suffered an adverse employment action? Yes." "(3) Do you find that the Plaintiff's protected activity in reporting alleged sexual harassment was a determinative factor or but for cause of the adverse employment action? No." Kelley, acting pro se as he did in the trial

court, has appealed, raising issues solely with respect to the retaliation claim.  We affirm.

Facts.  We recite the facts in the light most favorable to the department, the party for whom the jury found.  See Laramie v. Philip Morris USA Inc., 488 Mass. 399, 401 (2021).

Kelley was hired by the department as a seasonal recreation facilities supervisor at Ashland State Park for the summer of 2013, having scored the highest during the interview process.  This was a seasonal position with no guarantee of rehiring for the same position for the subsequent summer.

In early July 2013, Kelley overheard Jeff Culliton, his direct supervisor, on two occasions making inappropriate comments of a sexual nature in the presence of younger female and male laborers and lifeguards.  He brought these comments to the attention of Jeff Cate, Culliton's indirect supervisor, a "recreation facilities supervisor IV," who oversaw numerous department facilities, including Ashland State Park.

The plaintiff argued in closing, and the jury were instructed by the judge, that for purposes of § 151B, this reporting was the protected conduct in which in which Kelley engaged.  On July 7, 2013, Cate met with Culliton at Ashland State Park and confronted him about the inappropriate statements.  Culliton acknowledged he made the statements.  Culliton assured Cate that it would never happen again.  Cate

2

then initiated a follow-up meeting the next day with Culliton and Kelley, and Culliton apologized to both Kelley and Cate for the comments.

Kelley continued to work in the seasonal position for another fifty-seven days until the end of the summer. Kelley was given a performance evaluation at the end of the summer, in late August 2013. Culliton and his immediate supervisor, Richard Trubiano, both gave Kelley a "strong and good" job performance evaluation. His review was conducted face to face with Culliton, and Kelley described it as a great review without any criticism. Culliton wrote on August 31, 2013, that Kelley's performance met the requirements of all six factors on the evaluation form, without exception, and that "Joe proved to be a great help this summer" with a "very ambitious attitude and great public relations." The evaluation form also provided a section for the evaluated employee's response. There, Kelley wrote that one of the rewards of the job had been working with Culliton. Cate signed off on the evaluation form.

This evaluation was given despite the fact that, subsequent to the reporting of Culliton's statements to Cate, while working, Kelley had caused property damage to three pieces of department equipment. In one instance, he drove a department vehicle into a waterway requiring an approximately $1,600 replacement of the engine. The department elicited testimony

3

from Cate that Culliton had helped Kelley retrieve the vehicle from the water. Kelley testified that his interaction with Culliton that day was "amazing." Kelley was not reprimanded or disciplined by Culliton or Cate for damaging any of the equipment.

The results of Kelley's end-of-summer performance evaluation meant that Kelley would be eligible to apply for jobs with the department in June 2014, though it did not mean he was guaranteed a job.

In 2014, Kelley again applied for the seasonal recreation facilities supervisor position at Ashland State Park, because he had worked there the prior summer, as well as other department jobs. Kelley testified during cross-examination that he regarded the interview as a formality; Cate, however, did tell Kelley before the interview began that he had to answer the interview questions as if he were applying for the first time.

An interview panel composed of Cate, Culliton, and a third person, Sean Lovejoy, interviewed three candidates for the job, including Kelley. Based on the interviews, this panel gave Kelley the lowest scores of all three candidates. His score was approximately half the score he had gotten on the same interview the year before. During his 2013 interview, Kelley had received an average score of 38.5. By contrast, in 2014, Kelley received an average score of 17.3. The comments on Kelley's score sheets

4

noted that he failed to answer the questions asked during the interview and tended to ramble.  The highest scoring candidate, with an average score of 35.3, was hired for the job.

_Discussion_.  Before us, Kelley's primary complaint is about a jury instruction on temporal proximity as it related to his retaliation claim.  The judge instructed the jury,

> "Retaliation and temporal proximity.  You are permitted to infer retaliation from the timing and sequence of events. The inference may be drawn if adverse action is taken against a satisfactorily performing employee in the immediate aftermath of the . . . employers becoming aware of the employee's protected activity or where adverse employment action follows close on the heels of protected activity.  In other words, closeness in time between a protected activity and the adverse employment action allows, but does not compel, an inference that retaliation was a reason for the adverse employment action.  However, a substantial gap in time between a protected activity and any alleged retaliation may defeat an inference of retaliation."

Kelley argues first that the second sentence of this instruction is misleading and inaccurate in the context of his seasonal employment case.  He argues that, where seasonal employment ends and then resumes months later, retaliation that is effectively temporally proximate, indeed that may present the first opportunity to retaliate, may not occur "immediate[ly]" after the protected activity or "close on [its] heels," yet the jury may be unable to take account of that under this instruction.

5

The department argues that the claim with respect to the second sentence of the instruction was not adequately preserved. Kelley, who was pro se below, as he is before us, did raise this issue during the charge conference with the judge who instructed that while he understood the argument, he was not going to change the instruction, which the department asserts is from § 5.2.8, of the Massachusetts Superior Court Civil Practice Jury Instructions , but that Kelley could argue the point in closing (which he did not do).[1]  See Massachusetts Superior Court Civil Practice Jury Instructions § 5.2.8 (Mass. Cont. Legal Educ. 3d 2018).  The department says that this was not sufficient to preserve the claim of error because Kelley did not "state any clear or distinct objection."  Kelley points out that at least once during the charge conference the judge indicated that Kelley's rights were preserved by his having made an objection, and that, therefore, his raising the objection as he did preserved his rights.  Rather than resolving this dispute, we will assume without deciding that this claim of error was adequately preserved.

---

[1] We note that jury instructions are neither immune to review nor entitled to deference solely because they happen to appear in model jury instructions.  It is the obligation of the court to give accurate instructions on the facts of the case before the judge, and of the parties to proffer accurate instructions for the judge to consider when the judge requests them.

Kelley also argues that the last sentence of the instruction, instructing that "a substantial gap in time between the protected activity and any alleged retaliation may defeat an inference of retaliation," is also inaccurate, and that not all inferences of retaliation can be defeated by such a substantial temporal gap between the protected conduct and the adverse employment action. While this second complaint of Kelley is not without some force, the department correctly asserts that it was not raised below and it is therefore waived.[2]

Turning then to the portion of the instruction that we have assumed was properly challenged below, we conclude there is a substantial argument that the language of the sentence at issue is imprecise, and that, in particular, it may not adequately describe the proper way to assess the temporal proximity of protected conduct in an adverse employment action in the context of seasonal or other episodic employment. We will assume without deciding that that is the case here, that given the facts of the case, this instruction on temporal proximity might have misled the jury, and that its use was error.

---

[2] In a civil case of course we do not review unpreserved claims of error, even for a "substantial risk of a miscarriage of justice" as we do in criminal cases. See Costa v. Brait Builders Corp., 463 Mass. 65, 70 (2012), citing Carey v. New England Organ Bank, 446 Mass. 270, 285 (2006); Commonwealth v. Gaouette, 66 Mass. App. Ct. 633, 644 (2006).

7

Nonetheless, we conclude that in this case, any error was not prejudicial. This is because the actual adverse employment action here, undertaken nine months after the end of Kelley's 2013 summer employment, was not, remotely, the next, or even an early, opportunity for the department to retaliate against Kelley had that been its intent. Kelley continued to work after the protected activity for fifty-seven days and no negative consequence of any kind seem to have befallen him during that time.

Indeed, a number of events occurred during that period that might have formed the basis for proper, or pretextual, unfavorable treatment of Kelley, including the acts that damaged government property. But no such action appears to have been undertaken. At the end of the summer, any evaluation of Kelley could have included the fact of this property damage (or, indeed, some other pretextual ground) as reason for providing him with a less-than-best evaluation. Instead, he received the best possible evaluation. If Cate or Culliton had been keen to retaliate against him, they might not have unconditionally recommended him for rehiring the following year. But they did.

Kelley responds by saying that all this could have been part of a plan to retaliate at a temporarily distant point from the protected conduct precisely in order to avoid being caught in an act of unlawful retaliation. Although this is, of course,

possible, and something that could have been argued to the jury, it would have required an unusually high level of conspiracy and coordination on the part of Culliton and Cate.  It also would have required Culliton to have harbored ill-will against Kelley and to have planned to harm him, while simultaneously pretending to have the camaraderie with Kelley that Kelley himself contemporaneously described as one of the benefits of his work that summer.

The assumed error in the challenged jury instruction would only have been relevant to the jury's deliberations if they had made all the inferences Kelley suggests about a scheme by Culliton and Cate not to take action against Kelley at a series of earlier opportunities knowing that, eventually, after inviting Kelley back to interview in 2014, they would lower the boom on him.  Although this is not impossible, it is sufficiently unlikely that we do not think Kelley has met his burden of showing that any error in the instruction was prejudicial.

The plaintiff's remaining claim of error is that he was not allowed to put in evidence of a prior lawsuit against the department brought by another employee, Jeannie Kelley, who is not related to the plaintiff in this case.  Jeannie Kelley had been employed by the department as a clerk in the "Sign Shop." In 2006, a coworker and a supervisor in the "Sign Shop" began a

9

romantic relationship, which made other employees uncomfortable and resulted in blatant favoritism of the involved coworker by the subject supervisor.  Jeannie Kelley reported this conduct and subsequently suffered adverse schedule changes, was forced to take extraneous classes, and was ultimately transferred by the department to a less desirable position.  Jeannie Kelley filed suit against the department for retaliation and prevailed. The plaintiff argues that if evidence of the case had been admitted, it would have "magnified [the department's] motive to make [Joseph] Kelley disappear" and "informed the jury that [the department] knew full well what [its] responsibilities were."

In opposing the admission of this evidence, the department argued that it is irrelevant to this case, and that to whatever extent it is relevant, the risk of unfair prejudice to the department substantially outweighs the probative value of the evidence.

We review the evidentiary decision of the trial judge to exclude this evidence for abuse of discretion.  Commonwealth v. Paulding, 438 Mass. 1, 12 (2002).  Because of the risk that a jury would use this evidence improperly to conclude that the department has a propensity to engage in discriminatory conduct, see Cambridge Trust Co. v. Commercial Union Ins. Co., 32 Mass. App. Ct. 561, 564 (1992)("Ordinarily, evidence of an earlier wrongful act may not be introduced solely to prove a propensity

10

on the part of the defendant for a particular kind of conduct"), regardless of how we might have ruled in the original instance, we conclude that it was not an abuse of discretion for the judge to exclude the evidence.

For these reasons, the judgment is affirmed.

<u>So ordered</u>.

By the Court (Meade, Rubin & Hand, JJ.[3]),

*Joseph F. Stanton*

Clerk

Entered:   August 9, 2023.

---

[3] The panelists are listed in order of seniority.